HON. ASA O. ALDIS,
HON. JOHN PIERPOINT, } ASSISTANT JUDGES.
HON. JAMES BARRETT,

---

GEORGE T. HANFORD *v.* STEPHEN E. PAINE AND TRUSTEE,
JUSTUS EDSON.

*Assignments for the benefit of creditors. Conflict of laws. Comity.*

If a general voluntary assignment for the benefit of creditors be made according to the laws of the domicil of the assignor, it will be valid to pass all the personal property of the assignor wherever situated, unless its operation is limited or restrained by some local law or policy of the State where the property is found.

Hanford *v.* Paine et al.

The statute of 1852 relating to assignments, for the benefit of creditors, (Acts of 1852, p. 14,) it was intended, so far as personal property is concerned, to apply only to assignments, either made in Vermont, or made elsewhere by residents of Vermont, temporarily absent, or who went from this State for the purpose of making the assignment.

P., a resident of New York, made in that State an assignment of all his property for the benefit of his creditors. Among his property was an interest as partner in a stock of goods in a store in Vermont, which his partner, a resident of Vermont, carried on. The assignment was valid by the laws of New York, but it was not in accordance with the statute of this State relating to such assignments, and no copy of it was filed in any county clerk's office in this State; *Held,* that the statute of 1852, in relation to assignments, did not apply to the case, and that as the assignment was valid by the laws of New York, the personal property assigned, situated in this State, after the assignees had taken possession of it, passed fully to them, and was not subject to be attached, or held by the trustee process, at the suit of the creditors of the assignor.

The preference of the debts of our own citizens over those of the citizens of other States, in the case of a voluntary assignment for the benefit of creditors, made in another State by one domiciled there, and including within its operation personal property in this State, is to be deprecated except when by the laws of the State where the assignment is executed, such a discrimination is made in favor of its own citizens as would deprive our citizens of their fair proportionate share of the avails of the insolvent's property.

TRUSTEE PROCESS. The cause was referred to a commissioner, who reported that on the 18th of December, 1854, the defendant Paine, a resident of the State of New York, being insolvent, made in that State an assignment of all his property, both real and personal, to A. Fellows and Henry H. Hathorn, also residents of New York, in trust for the benefit of his creditors. In this assignment certain of the assignor's creditors were preferred, among whom were the assignees themselves. The assignment was in all respects in accordance with the laws of New York, but the provisions of the statute of this State, relating to assignments, passed in 1852, were not complied with in the following particulars: first, the assignment was not specific nor accompanied with an inventory of the property assigned; second, the assignees were among the creditors of the assignor provided for by the assignment; and third, no copy of the assignment was ever filed in any county clerk's office in this State.

The property of the assignor consisted of certain real and personal property situated in the State of New York, and a moiety interest in the stock of goods and other assets of a partnership, of which the assignor and the trustee, Edson, were the only members. This partnership was a mercantile one, and their business was carried on by Edson in Brookfield in this State, where he resided, and where their store and all their goods were situated. The other assets consisted of debts due to the firm from citizens of Vermont, and, together with the stock of goods, after deducting the partnership liabilities, amounted in value, at the time of Paine's assignment, to about four thousand dollars.

Immediately after the execution of the assignment in New York, the assignees went to Brookfield and notified Edson that Paine's interest in the property of the firm had been assigned to them. On the next day, the 20th of December, 1854, the assignees sold to the trustee all of Paine's interest in the stock of goods and other assets of the firm, which had been so assigned to them, for two thousand one hundred dollars, in payment whereof the trustee then paid them one hundred dollars in cash, and delivered them five notes of four hundred dollars each, dated at Brookfield December 20th, 1854, signed by the trustee and payable to the order of one Upham, in fifteen days, one, two, three and four months from date respectively, and endorsed by Upham.

After this sale and the delivery of these notes to the assignees, and before the maturity of any of the notes, the plaintiff, who was also a citizen of New York, and one of Paine's creditors, caused this trustee process to be commenced against Edson.

Upon this report of the commissioner the county court, at the September Term, 1858, BENNETT, J., presiding, adjudged that the trustee was not chargeable, to which the plaintiff excepted.

*Asahel Peck* and *Frederick G. Hill*, for the plaintiff.

1. It is well settled that if the law of the domicil of the vendor, where the contract is made, is injurious to the public rights or the interests of the citizens, or offends the morals, or contravenes the policy, or violates any of the positive laws of the country where the property is situated, it must yield to the law of the place of the *situs* of the property at the time of the trans-

fer; 2 Kent's Com. 457–8, note b.; Story's Confl. of Laws, secs. 383, (note 4,) 327, 423, (a.) 550 and 390; *Taylor* v. *Board-man*, 24 Vt. 581; *Atwood* v. *Protection Insurance Co.*, 14 Conn. 555; *Norris* v. *Mumford*, 1 Cond. Louis.; *Olivier* v. *Towns*, 2 *ib.* 606; *Ramsey* v. *Stevenson*, 1 *ib.* 338; *Thuret* v. *Jenkins*, 1 *ib.* 566.

2. That it is competent for our legislature to prescribe a par-ticular mode of conveyance by which property, both real and per-sonal, situate and being within its jurisdiction, shall be trans-ferred, and which should be observed by the courts, we appre-hend admits of no doubt; *Hunter* v. *Potts*, 4 Term 182; *Prall* v. *Richmondville Manufacturing Co.*, 9 Conn. 487; *Atwood* v. *Protection Insurance Co.*, 14 Conn. 555; *Van Buskirk* v. *Hartford Fire Insurance Co.*, 14 Conn. 483; *Holmes* v. *Remsen*, 20 Johns. 229, 253, 268; 2 Kent's Com. and Story's Confl. of Laws, *ub. sup.*

3. The statute of 1852, relative to assignments, relates to assignments made out of the State as well as those made in the State, when sought to be enforced or made operative on property situated here. It is general and without exceptions or qualifica-tions, and must govern as to property situated here at the time of the transfer; *Prall* v. *Richmondville Manufacturing Co.*, 9 Conn. 487, 494; *Atwood* v. *Protection Insurance Co.*, 14 Conn. 555; *Zipcey* v. *Thompson*, 1 Gray 243; 1 Green 326, cited in 2 Kent's Com. 458, and in 14 Conn. 559; Story's Confl. of Laws, sec. 472 (*a.*), 473 (*b.*), 524. Our statute relating to the pay-ment of debts of deceased persons equally or *pro rata*, applies not only to our own citizens, but to all foreign creditors who have their claims allowed, without reference to the law of the domicil of such creditors. This is more analogous to the case at bar than the statute relating to the distribution among heirs by succession.

4. In this assignment and the course pursued under it, not only have the parties acted in direct contravention of the second, third, fourth and eighth sections of our statute of 1852, but the policy of our law has also been departed from. The rule pre-scribed by the legislature as applicable to assignments is well calculated to accomplish its objects, which are, among other

things, to promote the interests of citizens in an expeditious, safe and cheap manner, and obviate the delay, insecurity and suspense to which the execution of such trusts under the common law were subject.

5. But whatever may be the rule as applicable to isolated pieces of personal property in this State, accidently or temporarily here, we insist that the statute must be complied with in cases like this, where the assignor, resident out of the State, has entered into and carries on business here under our laws, and has accumulated property here and contracted debts on the faith of it, and the subject of the assignment is the entire property of the concern, and its effect is to render it impossible for the assignor's creditors to attach any of his property in this State. In such a case the business acquires a *situs* or domicil here, and the law of the *situs* or domicil of the business, and not of the assignor, should govern the transfer, and more especially so because the assignment, so far as the property in question is concerned, was to be carried into effect in this State. The rule is well settled that a contract is to be governed by the law of the place where it is to be executed; *Pecks & Co.* v. *Barnum and Trustee,* 24 Vt. 75 ; 2 Cond. La. 609.

6. If a person sends his property into another jurisdiction from that of his residence, he by implication submits it to the rules and regulations in force in the country where he places it, and if he dies, so far as concerns creditors, it is governed by the laws of the place where it has its actual *situs;* Story's Confl. of Laws. secs. 388, 524.

7. If the transfer of property situated here is governed by our law, it makes no difference that the plaintiff is a citizen of New York. Our statute expressly makes the contract void as to the creditors, and subjects the property to attachment and the trustee process, and if the assignment is invalid as to creditors resident in Vermont, it is equally so as to creditors resident in New York or any other State. It is either valid or invalid, without reference to the residence of the parties. Any such discrimination would lead to endless confusion, and is not sanctioned by principle or authority. The consideration that the allowance of a foreign law to supercede our own as to property situated here would

contravene the policy of the law of this State, and be injurious to our citizens, may furnish a reason for not regarding such foreign law, but it affords no ground for applying our law to our own citizens and another law to citizens of another State, in regard to the same subject matter ; *Zipcey* v. *Thompson*, 1 Gray, 243.

*William G. Shaw*, for the trustee.

The assignment, being valid in New York where it was executed, and where the assignor and assignees resided, and where a portion of the assigned property was located, is valid also in Vermont. Being a New York assignment, it is to be governed by the laws of that State.

It is a general principle of universal jurisprudence that personal property has no *situs*, but, wherever situated, is governed as to the rules of succession, testamentary disposition and voluntary transfer, by the laws of the owner's domicil, if the transfer is made there. The universal acquiescence of all civilized nations in this principle shows its justice, while experience and reason alike demonstrate that it is the only rule by which an extensive and harmonious commercial intercourse between different nations can be maintained.

To this salutary rule there are but three exceptions:

1. When its application will tend to a violation of the cardinal principles of morality and to the encouragement of crime.

2. When, if enforced, it will have the effect to injure the citizens of the country where the property is found.

3. When the common or statute law of such country contains an express and unequivocal provision in regard to the mode of transfer or the rule of distribution of *all* property within its limits, whether owned out of its jurisdiction or not; *Saunders* v. *Williams*, 5 N. H. 215 ; *Van Buskirk* v. *Hartford Fire Insurance Co.*, 14 Conn. 584 ; *Ward* v. *Morrison*, 25 Vt. 593 ; *Whipple* v. *Thayer*, 16 Pick. 25 ; *Daniels* v. *Willard, ib.* 36 ; *Burlock* v. *Taylor*, 16 Pick. 335 ; *Bholen* v. *Cleveland*, 5 Mason 174 ; Burrill on Assignments, 362 *et seq.* ; Story's Confl. of Laws, chap. 9, secs. 379 and 380.

It will not be claimed that the case at bar comes within either

Hanford *v.* Paine et al.

the first or the second exception, because there is nothing immoral in this assignment or its purposes, and because the interests of citizens of Vermont are not affected by the question at issue, the controversy being entirely between citizens of New York.

The real question, therefore, is, whether this case comes within the third exception ; and, as there is no provision of the common law of this State which is in any respect contravened by this assignment, the question is simply whether the act of 1852, in relation to assignments for the benefit of creditors, (Laws of 1852, p. 14,) applies to assignments executed in another State by a non-resident of Vermont, including within their terms and operation, not only real and personal property situated elsewhere but also movable personal property in this State.

While the power of the legislature to make a law with such an application, and for that purpose, is not to be denied, still the general principle, which such a law would contravene, is of so great utility and almost indispensable necessity for all the purposes of a liberal and harmonious commercial intercourse with our sister States and other countries, and has received so universal a sanction from the whole civilized world, that none but the most certain and unambiguous words should be construed to abrogate it.

The language of every statute, except when it in terms provides expressly otherwise, is construed to apply only to acts done or duties neglected within the limits of the State by which it is enacted. In the first section of the statute of 1852, the words ." all assignments hereafter *made* of property, etc., etc.," therefore, mean " all assignments hereafter made in this State, etc." The third section, which requires a copy of the assignment to be filed in the county clerk's office in the county *where the assignment is made*, shows that the statute was intended to operate solely upon assignments made *within this State*.

The statute of distributions of the personal estate of deceased persons, (Comp. Stat., chap. 51, p. 335, sec. 1,) is as general and comprehensive in its terms as that of 1852, in regard to assignments. It has never been claimed that this statute applies to any other than a resident of Vermont. So also of the statute of wills ; Comp. Stat,, p. 327, sec. 6 ; 2 Kent's Com. 429.

These three statutes are equally general and comprehensive, and there is no reason why they should not be governed by the same rule of construction.

The assignment law of 1852, like the statutes of distributions and of wills, and the great bulk of our laws was meant to apply to *our own citizens,* or to acts done and contracts made within our own territorial limits. It was intended to control assignments made in Vermont, either actually or constructively, by citizens of Vermont, and governs their movable personal property included in such assignments, wherever it may be. It also applies to assignments actually, and in good faith, made and executed in Vermont by citizens of other States. It was meant to control *Vermont* assignments and none others.

In numerous cases the great principle that personal property has no *situs,* but is governed and controlled by the law of the owner's domicil, has been applied to laws prescribing conditions and modes of a valid assignment for the benefit of creditors, and in every case the decision has been that *so far as regarded creditors who were not citizens of the State where such laws existed,* they did not apply to assignments made out of such State by non-residents, though such assignments might include within their terms personal property located within its territorial limits.

*Whipple* v. *Thayer,* 16 Pick. 25; *Daniels* v. *Willard, ib.* 36; *Burlock* v. *Taylor, ib.* 335; *Van Buskirk* v. *Hartford Fire Insurance Co.,* 14 Conn. 584; *Ward* v. *Morrison,* 25 Vt. 593; *Sanderson* v. *Bradford,* 10 N. H. 260, construing New Hampshire Revised Statutes, 260; *Mallory* v. *Snow and Trustee,* Law Reporter, November, 1858, p. 431; *Martin* v. *Potter, ib.* 558, construing Massachusetts Statutes of 1836, chap. 238, sec. 11, and the general insolvent laws of Massachusetts, 39 and 40; *United States* v. *Bank of the United States,* 8 Robinson (La.) 263; *Merchants' Bank of Baltimore* v. *Bank of the United States,* 2 Louis. Ann. Rep. 659; *Chewning* v. *Johnson,* 5 *ib.* 678; *Richardson* v. *Leavitt,* 1 *ib.* 430; *Chartres* v. *Carnes,* 3 Cond. La. Rep. 208; *Speed* v. *May,* 17 Penn. St. (5 Harris) 91; *Law* v. *Mills,* 18 Penn. St. (6 Harris,) 185; *Caskie* v. *Webster,* 2 Wallace, Jr., 131; *Forbes* v. *Scannell,* 1 Labatt (California Dist. Ct.) 132; *Frazier* v. *Fredericks,* 4 Zabriskie (N. J.) 162; Burrill on

30

Assignments, 2d Ed., 263–5; *Maberry* v. *Shisler*, 1 Harrington, (Del.) 349.

The doctrine advanced by the plaintiff, and on which he wholly relies, if admitted to be sound, renders entirely unmeaning the numerous decisions and *dicta* of the most eminent judges and law writers of this country, who therein positively assert the difference between voluntary and involuntary assignments, between those caused solely by the act of the party, as the one now before the court, and those caused by the act of the law, as assignments under a bankrupt or insolvent law. This distinction is well settled to be that the *lex domicilii* controls in the former case, but in the latter the *lex loci rei sitae* governs; *Frazier* v. *Fredericks*, 4 Zabriskie (N. J.) 162; GRIER, J., in *Oaskie* v. *Webster*, 2 Wallace, Jr., 131; Burrill on Assignments, 2d Ed., 365, (note 3,) 370; *Hoyt* v. *Thompson*, 1 Selden 352; *Saunders* v. *Williams*, 5 N. H. 214; *Speed* v. *May*, 17 Penn. St. 94; *Sanderson* v. *Bradford*, 10 N. H. 264; Story's Confl. of Laws, sec. 411; *United States* v. *Bank of United States*, 8 Rob. (La.) 414; *Holmes* v. *Remsen*, 20 Johns. 265; *Milne* v. *Morton*, 6 Binney 361; *Blake* v. *Williams*, 6 Pick. 314; *Green* v. *Mowrey*, 2 Bayley (S. C.) 113, cited in note to 2 Kent's Com. 407.

The plaintiff is also compelled, by the force of his position and the tenor of his argument, to ignore the theory of that long series of respectable authorities which assert the principle that a general law in regard to the mode of transfer of personal property, which does not *in express terms* apply to all property within the limits of the State, without regard to the domicil of the owner, will be extended so as to form an exception to the great principle that personal property is referable to, and controlled by the laws of the owner's domicil, only when the rights and claims of creditors, *who are citizens of the State where the property is found*, and such law exists, are concerned. In such cases the law of the State where the property is situated is held by these authorities to govern it, so far as the claims and debts of *citizens of that State* are concerned, and no further; *Potter* v. *Brown*, 5 East 124; *Ingraham* v. *Geyer*, 13 Mass. 146; *Fall River Iron Works* v. *Croade*, 15 Pick. 11; *Sanderson* v. *Bradford*, 10 N. H. 265; *Olivier* v. *Towns*, 2 Louis. Cond. 606; *Merchants' Bank* v. *Bank of United States*,

2 Louis. Ann. 661 ; *Chewning* v. *Johnson*, 5 *ib*. 679 ; *Ward* v. *Morrison*, 25 Vt. 593 ; *Maberry* v. *Shisler*, 1 Harrington (Del.) 349 ; Burrill on Assignments, 2d Ed., 363–5, 370 ; *Van Buskirk* v. *Hartford Fire Insurance Co.*, 14 Conn. 587.

This preference by a State of its own citizens to those of a sister State may seem illiberal, and if the question were *res integra*, might possibly not receive the approbation of this court.

But we feel confident that if this court ever abandon this ground, it will not recede to the narrow and exclusive position of the plaintiff's counsel, but, on the contrary, will advance to the broad and liberal ground of the Pennsylvania court in the cases from that State above cited, which recognizes in its fullest extent the great fundamental principle characterizing personal property, the application of which we claim to this case, and considers it subject to no exception in favor either of foreign or domestic creditors, unless it has been expressly and unequivocally repealed by legislative enactment.

It is claimed by the plaintiff that there is a distinction, as to the operation of a law like that of 1852, between debts due from a citizen of this State to a citizen of another State, and tangible personal property situated here but owned in another State, and while it is admitted that that law is not applicable to the former kind of property, he insists that it does operate upon the latter.

This position is indeed supported by the *obiter dicta* of STORRS, J., in *Atwood* v. *Protection Insurance Co.*, 14 Conn. 555, but it is contrary to the common law, which makes no distinction between these two kinds of personal property, as to their being controlled by the *lex domicilii* and the *lex loci contractus*. It is also directly opposed to the following cases : *Whipple* v. *Thayer*, *Daniels* v. *Willard*, *Burlock* v. *Taylor*, all in 16 Pick. ; *Mallory* v. *Snow and Trustee*, Law Reporter 1858, p. 431 ; *Law* v. *Mills*, 18 Penn. St. 185 ; *Merchants' Bank* v. *Bank of United States*, 2 Louis. Ann. 659 ; *Richardson* v. *Leavitt*, 1 *ib*. 430 ; *United States* v. *Bank of United States*, 8 Robinson (La.) 262.

REDFIELD, Ch. J. The general question involved in this case is one of a good deal of practical importance, and one in regard to which there is obviously more or less conflict among the decisions in other States.

There are some points in regard to which we think there is no just ground of controversy. We see no good reason why any different rule should be applied to this case, because of the extent and variety of the property involved. It would be difficult, if not impossible to define a rule upon this subject resting upon any such basis. All would agree, we believe, that if the assignor had been a resident of the State, at the date of the assignment, and had gone out of the State for the purpose of making the assignment, or, being temporarily out of the State, had made the assignment, in either case it must still be governed by the requirements of our law in relation to such contracts. Any other view would operate as a virtual fraud upon the law.

But if the assignor has a bona fide residence out of the State, we do not perceive why his contract of assignment may not with the same propriety be held to convey his interest in this mercan-tile partnership as in any single article of personal property within the State, or a chose in action owing from one resident here.

We feel that there can be no question in regard to the right of the legislature to restrict and limit the freedom of alienation of personal chattels or of choses in action within the State, or to prohibit it altogether, or even to provide for its escheat to the State, after the decease of the present proprietors, unless restricted by constitutional limitations. And by parity of reason the legislature must have the right to prescribe any formalities in the conveyance of personal property, which they may deem expedient, and to make them universal in their application to all who hold property here, as well those residing without as within the State. There can be no doubt of the power of the legislature in this respect. That was never questioned.

But it has long been the policy of commercial States not to embarrass the free transmission of the title to personal property. And it has been very justly considered as discourteous and illiberal policy in one State to abridge and fetter the operation of foreign contracts within its limits, or to refuse to enforce them by suits maintained in its courts, or to embarrass foreign owners of personal estate within its limits, in the free enjoyment of its beneficial use, or its ready and unrestricted conveyance. Hence courts have long felt a reluctance to establish any restrictions of

this character by means of construction merely.    But where such is the fair and reasonable interpretation of a statute, the courts can feel no delicacy and no reluctance in the matter.

I.    The great and leading question made in the argument of this case is, whether the statute of 1852, in relation to assignments for the benefit of creditors, was meant to apply to all such contracts intended to operate upon personal property within the State wherever such assignments might be executed.    It must be very obvious to any one examining the special provisions of the statute of 1852, that it could only have been intended primarily to apply to cases where the assignor resided within the State, and where the assignment was to be here carried into effect by the assignees.    By the third section it is made the duty, both of the assignor and the assignee, to file in the office of the county clerk, " in the county where the assignment is made, and the property assigned is situated, a true copy of the assignment and of the inventory," etc.    By the sixth and seventh sections, provision is made for compelling the assignee to give account of his administration of the trust by proceedings before " the chancellor of the circuit."    None of the provisions in these sections, which constitute one third of the statute, could have any possible application to an assignment made out of the State.    The statute without these provisions would be a very lame and imperfect affair.    And the fifth section, which provides for the assignee filing with the " clerk of such county " a " copy of the settlement of his trust account," must also be regarded as having exclusive reference to transactions conducted within the State.    It is, therefore, sufficiently obvious that this statute could not have been intended primarily to apply to assignments made, and to be carried into effect without the State.    It seems to me as obvious that this statute was not intended to apply to assignments made out of the State, as if the statute had in terms provided that all assignments hereafter made *in this State,* etc.

But it may still be urged that this statute must be regarded as applicable to all property within the State, personal, as well as real.    But it seems to us that as no such thing is expressed in the act, it would be contrary to the general policy of commercial States to adopt such a view by construction merely.    The inclin-

ation of courts and the general policy of the law is certainly otherwise.

In the law, personalty is generally regarded as having no *situs.* Its title, mode of transfer, and other incidents connected with its use and transmission, are regulated according to the law of the place of the domicil of the owner. This is confessedly true in regard to the requisite formalities in the execution of a will of personalty, although essentially departing from the requirements of the law of the State where such property happens to be situ- ated at the time of the decease of the owner. It is the law of the place of the domicil of the owner which must control these inci- dents, as to the operation of wills upon personal estate, and also the distribution of intestate estates, according to the general rules of international comity among civilized and commercial States. There can be no doubt of the right of any State to interfere in these matters, even to the extent of prohibiting the operation of foreign wills within its limits. But that is seldom attempted in modern days.

But it is claimed that in regard to the distribution of one's effects (while living) among his creditors, a different rule to some extent has prevailed. This may be true perhaps. One State is not bound to send property, found within its limits, abroad to be administered upon, either by assignees, whether voluntary or compulsory, or by personal representatives after death, so long as there are creditors within the State who would thereby be deprived of an equal share with the creditors in the place of the domicil of the debtor. This is the express rule of this State in regard to insolvent estates of deceased persons domiciled abroad. And we see no reason why, upon general principles, we might not expect the same rule to obtain in regard to the effects of liv- ing insolvents. But there are, no doubt, many considerations to be taken into the account in determining such a question. It has been held that in giving effect to an assignment for the benefit of creditors made out of the State, we act upon considerations of comity merely. This must undoubtedly be received with some qualification. It is certainly not true that we could regard the binding effect of such an assignment, in regard to personal prop- erty remaining within the State, as dependent upon the ques-

tion, whether the State where such assignment was made would give effect to an assignment made in this State, as to property in that State. That would certainly be a very narrow and unmanly view of the subject. For this might result merely from a misconception of the law by the courts of that State, and a misapplication of the principles, which, according to the generally admitted doctrines of commercial law, ought to have controlled the question. The view proposed would then amount to nothing less than the law of retaliation, the *lex talionis;* SHAW, Ch. J., 19 Pick. 107.

The only ground which could fairly justify the courts of one State in refusing to recognize such contracts made in other States, by persons domiciled there, as matter of comity, must have reference either to a general want of confidence in the mode in which the general principles of commercial law are there administered, which is but another name for the character and standing of such State in regard to civilization and christianity, or it must have reference to the manner in which we suppose our citizens would be affected by sending them into the *forum* of that State, for the recovery of their claims against the assignor in the particular case.

We think this State or any christian State might perhaps fairly be justified in refusing to send its own citizens into Japan or China to obtain payment of a claim against a person domiciled there, and who had there made an assignment of his effects, provided these citizens could obtain payment of such claims, through the attachment and sale of the property of such debtor, remaining in the State where the creditor resided.

And if any of the American States make, by their general laws, such a discrimination in favor of their own citizens in the distribution of the effects of insolvents, either living or dead, as to amount to a virtual denial of justice or of equality of right in such distribution to our citizens, we might fairly claim to apply such property of the insolvent as was found in this State, to the payment of such debts as were owing to our citizens. Beyond this it does not occur to me that, upon principle, we could fairly be justified in making any discrimination in favor of one of our citizens. And neither of these grounds would ordinarily find any

basis for their application, in regard to assignments, made in any of the American States.

The ground upon which courts in one State have refused to give effect to *involuntary* assignments, made in foreign States under the insolvent and bankrupt laws of such countries, is sufficiently justified upon the ground that such assignments are affected by the judgment of the courts of such foreign States, which can of course have no effect, either upon persons or property, in other States, of which they have no jurisdiction, unless it is effected by transferring such property or persons into the States where such courts exist, and thus giving a sort of *ex post facto* jurisdiction. This is sometimes done by persons abroad coming into the insolvent court, and presenting their claims, and accepting a dividend upon them with the general creditors. This makes the discharge a bar to such claims, although the court would have had no jurisdiction over them if they had not been voluntarily presented; *Peck* v. *Hibbard*, 26 Vt. 698. As to the general principle that involuntary assignments under foreign bankrupt and insolvent laws are not binding upon persons or property situated without the States where made, the cases of *Harrison* v. *Sterry*, 5 Cranch. 289 ; *Hoyt* v. *Thompson*, 1 Selden 320 ; *Britton* v. *Valentine*, 1 Curtis 168 ; and 2 Kent's Com. 405–408, and the cases cited by the learned commentator, will be sufficient. The doctrine is most unquestionable, and rests upon grounds entirely aside of those affecting voluntary assignments, that is, upon the want of jurisdiction in the courts making the judgment of compulsory assignment.

In regard to general voluntary assignments for the benefit of creditors, it seems to be an admitted rule, that if according to the laws of the place of the domicil of the assignor, they will have the effect to pass all the personal property of the assignor, wherever situated, unless their operation is limited or restrained by some local law or policy of the State where the same is situated ; Story's Conflict of Laws, sec. 423 (*a.*) ; Burrill on Assignments, 363 *et seq.*

In the second edition of Burrill on Assignments, a thorough and exhaustive digest and analysis of the cases upon this subject will be found, pp. 363–372. A careful review of the cases shows

very clearly that the preponderance of authority is greatly in favor of the general view above stated. This examination could scarcely fail to bring all fair minded persons to the same conclusion with this careful and painstaking writer. This author says that in all the cases where a voluntary assignment, valid where made and operative by the laws of the place of the domicil of the owner to transfer personal property everywhere, has not been held to have that effect, as is the fact in some few of the American States, it has been only in favor of the citizens of the States where such decisions have been made. " As against citizens of other States and especially as against citizens of the State where the assignment was made, the rule appears to hold without qualification, that an assignment, valid by the laws of the State in which it is made, is valid everywhere." This limitation of the exception would narrow its operation so as not to include the plaintiff's claim in the present case, he being not only not a resident of this State, but being a resident of the State of New York, where the assignment was made, and the assignor domiciled at the time, and by the laws of which State it is entirely valid to transfer all the personal property of the assignor wherever situated.

We do not desire, however, to have it understood that we are willing to place our decision upon any such narrow ground. We regard that class of cases which have assumed this ground in regard to the citizens of the other American States, by way of a narrow and specific retaliation, or what is still more ungenerous, for the purpose of giving their own citizens an unequal advantage, as resting upon no enlarged and liberal notions, either of national or general policy. This is the view maintained by SHAW, Ch. J., in *Means v. Hapgood and Trustee*, 19 Pick. 105–107. It is there said " courts of law are competent to take notice of general considerations of comity; but it is not, we think, within their province to attempt to enforce a precise system of retaliation, by adopting the precise rules against their citizens, which their courts adopt against ours." The very least which could fairly justify our courts in discriminating in favor of our own citizens, would be the certainty that the courts of the State, where the assignment was made, would do so in regard to their own

citizens, and thus deprive our citizens of that equal justice, which they are entitled to demand and to expect in all civilized and commercial States. One may be compelled to do this as to bar- barous and pagan States. We trust Vermont will only do it, in the strictest sense, or by way of necessary self defence.

The principle of the leading case in Massachusetts, *Ingraham* v. *Geyer*, 13 Mass. 146, where the rule of discrimination in favor of their own citizens, as to voluntary assignments of insol- vents made abroad, is first attempted to be maintained, is virtually condemned by the same court in the case of *Means* v. *Hapgood*, 19 Pick. 107, when it came under consideration as the decision of a neighboring State. SHAW, Ch. J., there says, that the case of *Fox* v. *Adams*, 5 Greenleaf 245, " has been repeatedly doubted in this State." And this last case was decided expressly upon the authority of *Ingraham* v. *Geyer*, and is in principle the same.

All the other cases in the American States, where voluntary assignments made in other States have been held inoperative against the attachment of personal property by citizens of their own States, have gone upon the narrow and illiberal policy of giving their own citizens an advantage over those of other States. That has sometimes been alluded to by our own courts, by way of argument or illustration, but it has not obtained countenance of late, and certainly ought not to be encouraged, unless in strict self defence.

The authority in the opposite direction is of far greater amount, besides resting upon grounds which commend themselves both to our sense of justice and consistency with principle; *Cuskie* v. *Webster*, 2 Wallace, Jr. 131; *Law* v. *Mills*, 18 Penn. St. 185; *United States* v. *Bank of United States*, 8 Robinson (La.) 262; *Dundas* v. *Bowler*, 3 McLean 397.

The Massachusetts court has, in many instances, and in com- paratively recent times, (*Zipcey* v. *Thompson*, 1 Gray 243,) repu- diated the notion of giving effect to voluntary assignments by insolvents when they operated against their local legislation, or to defeat attachments made by their own citizens, but they assign no grounds or reasons for such a course which would not equally justify that State in disregarding all foreign contracts which

seemed unfavorable to their interest, or not in strict conformity with the special provisions of their local law.

In Connecticut, in *Atwood* v. *Protection Insurance Co.*, 14 Conn. 555, such assignments are held valid to pass property in that State, although not conforming to the specific requirements of their law, very similar to many of the requirements of our assignment law of 1852. So also in New Hampshire, *Sanderson* v. *Bradford*, 10 N. H. 260.

We have thus disposed of all which could fairly be urged in favor of holding the trustee liable, in this State, unless it be the claim that these provisions of our assignment law must be regarded by our courts as something pertaining to the settled policy of the State, in regard to the disposition of the effects of insolvents among their creditors, or else that it was meant to attach to all such contracts intended to affect property here situated, wherever made.

But we think there is no plausibility in adopting either of these views. We have said that these provisions of the statute are of a character to indicate very clearly that they were designed to have operation only upon assignments made within the State. And they do not indicate any purpose of being applied to the property conveyed, instead of the contract. They are regulations affecting a particular class of contracts, and not the general mode of transferring personal property for the benefit of creditors. There is more plausibility in the argument which attempts to apply them to all assignments of property for the benefit of creditors, than in that which would make them a portion of the fixed policy of the State, in regard to the disposition of property for the payment of debts of insolvent persons, whenever such property is found in the State, like, for instance, our rule of law requiring a delivery of the property in order to put it beyond the reach of process. The Louisiana cases cited go upon this ground. But we are not prepared to adopt this view even.

In every view which we are able to take of the case we think the trustee was properly discharged, and, consequently, the judgment is affirmed.