CRIPPEN v. ROGERS & a.

The law of this state does not unnecessarily allow its process to be used by a creditor residing in another state to avoid the just operation of the insolvency law of that state.

| 67 | 207 |
| 70 | 587 |

When a Massachusetts creditor, A, has attached property in this state for the benefit of all the creditors of a Massachusetts debtor against whom insolvency proceedings have been commenced in Massachusetts, and another Massachusetts creditor, B, refusing to become a party to the insolvency proceedings, has made a subsequent attachment of the same property in a suit brought in the name of a citizen of this state to whom B transferred his claim for that purpose, B cannot maintain a bill in equity for an injunction against the prosecution of A's suit.

BILL IN EQUITY, for an injunction restraining the defendants, Rogers, Wood, Loring & Co., from prosecuting their action against Potter, White & Bayley; also restraining the defendant Nutter from applying the proceeds of property attached by him as deputy sheriff in satisfaction of any judgment that may be recovered in said action; also restraining the defendants Dunn, Allen, and Bullens, assignees in insolvency in Massachusetts of the estate of Potter, White & Bayley, from attempting to recover under the deed of assignment to them in the insolvency proceedings the property attached by Nutter.    The bill was filed October 1, 1891.

Facts agreed.    The plaintiff is a resident of this state.    All the defendants except Nutter, who is a resident of this state, are residents of Massachusetts.    May 25, 1891, Rogers, Wood, Loring & Co. commenced an action against the firm of Potter, White & Bayley in the supreme court for Strafford county, to recover two

promissory notes amounting to $37,500 ; and Nutter, as deputy sheriff, attached on the writ personal property of the debtors, consisting of shoes and shoe stock, of the value of more than $20,000, in the shoe factory of A. Nute & Sons in Farmington, and summoned Nute & Sons as trustees.

May 26, Potter, White & Bayley, being unable to meet their maturing liabilities, made an assignment covering their property in Massachusetts and New Hampshire to Dunn, Allen, and Bullens. Rogers, Wood, Loring & Co., who advised the assignment, being holders of other notes besides those sued in New Hampshire, became a party to the assignment by signing the same with other creditors, reserving, by a clause inserted in their acceptance, all their rights under their attachment.

The property attached, by agreement between the assignees, attaching creditors, and debtors, was mostly manufactured into shoes, and sold by the officer September 2 under the provisions of the statute authorizing the sale of perishable property, the net proceeds after paying the expense of manufacturing and the expenses of sale being $22,224.10, which sum is now held by the officer. August 24, 1891, proceedings in insolvency were commenced in Massachusetts against Potter, White & Bayley, and later Dunn, Allen, and Bullens were appointed assignees.

Before Rogers, Wood, Loring & Co. commenced their suit, they agreed verbally with Dunn and Allen to attach the property in New Hampshire for the benefit of all the creditors of Potter, White & Bayley who should agree to share ratably in the assets of the debtors. July 9, Rogers, Wood, Loring & Co., Potter, White & Bayley, and Dunn, Allen, and Bullens agreed in writing that the expense incurred by Rogers, Wood, Loring & Co. in their attachment should be paid by the assignees, and that whatever sum Rogers, Wood, Loring & Co. should recover in their suit should be paid to the assignees for distribution under the terms of the assignment.

May 26, 1891, the National Bank of Redemption of Boston held two promissory notes against Potter, White & Bayley, one for $4,490, which matured May 29, and one for $4,520, which matured June 25. June 1 the bank employed one Leonard, an attorney at law in Boston, to go to Concord, New Hampshire, and, if possible, sell to Crippen, the plaintiff, for $4,000 the note maturing May 29. Leonard took with him the following letter of introduction: "Boston, Mass., June 1, 1891. H. J. Crippen, Concord, N. H. Dear Sir: Allow me to introduce to you Mr. W. H. Leonard of Boston. We would be very much obliged to you if you will transact the business with him which he has in hand, as he fully represents us in the premises. Very truly yours, E. A. Presbey, Cashier." Leonard also took with him the following guaranty : " Whereas, the National Bank of Redemption has sold this day to H. J. Crippen of Concord, N. H., a note signed by

Potter, White & Bayley to their own order and endorsed by them, dated November 26, 1890, on six months, for forty-four hundred and ninety dollars, now, therefore, in consideration of the purchase of said note by the said H. J. Crippen, the National Bank of Redemption hereby agrees to pay H. J. Crippen any deficit which the said Crippen may sustain by reason of his inability to recover the full amount of said note against said Potter, White & Bayley, and also to pay said Crippen a sum equal to all his costs, charges, and expenses incurred in any attempt to collect the same, including interest. The National Bank of Redemption, Boston. E. A. Presbrey, Cashier. [L. S.]    June 1, 1891."

Leonard delivered to Crippen the letter of introduction, note, guaranty, and a printed copy of the case of *Proctor* v. *National Bank of the Republic*, reported in 152 Mass. 223. Crippen consented to take the note on the terms proposed, and promised to send his check in payment of the same on the next day. Leonard returned to Boston early on June 2. Later in the day, Crippen received a letter from the bank addressed to Leonard. He did not open it, but delayed sending his check, and wrote to the bank as follows: " Mr. Leonard called on me last evening and arranged for me to take the Potter, White & Bayley note, $4,490. I find this morning enclosed letter for him. Not knowing whether you wish to change the arrangement, I will wait till I hear from you before doing anything about the note." The bank received the letter June 3, and sent the following telegram in reply: " Letter received. No change. Send us check." On the same date the bank also sent Crippen the following letter: " Your letter of 2nd inst. received and contents noted, to which I have replied by wire as follows: ' Letter received. No change. Send us check.' "

June 3, Crippen drew his check on the National State Capital Bank of Concord for $4,000, and the next day took the same to Boston to the Bank of Redemption and delivered it to the cashier, who offered to lend him the money if he had not money to spare. Crippen thereupon gave his promissory note for $4,000, dated June 4, payable on demand to the Bank of Redemption, and the bank discounted it. Crippen paid it March 17, 1892.

July 16, the Bank of Redemption sent the note for $4,520, maturing June 25, to Crippen, with a written guaranty similar to that of June 1, in the following letter: " Enclosed I hand you note of Potter, White & Bayley, dated December 22, 1890, payable six months after date, for $4,520, which we hereby sell to you for $4,000. E. A. Presbrey, Cashier." Crippen made no reply except to acknowledge the receipt of the note. July 25, the bank wrote again, and as follows: " H. J. Crippen, Esq.: Will you kindly send me your check for note Potter, White & Bayley, sold you 16th inst., say $4,000, and much oblige E. A. Presbrey, Cashier."

July 25, or shortly before, Crippen delivered the note to S., an

attorney of Concord, and arranged with him to take the note in Crippen's stead.  S. prepared a guaranty for the bank to execute to him instead of Crippen, made his note for $4,000 payable to the bank, and delivered it and the guaranty to Crippen to be sent to the Bank of Redemption, which Crippen did in a letter of which the following is a copy : " I have arranged with " S. " to take the note of Potter, White & Bayley, and enclose a letter from him. . . . I spoke to him about this some time ago, but he had been out of town, which caused the delay.  I presume it will be as satisfactory to you as if I took it.  If not, let me know, and I will cancel the arrangement and take it myself."

This letter was received July 28, and the bank wrote in reply on the same day as follows : " Your letter of the 25th inst. duly received.  Enclosed I return the note of " S., " also his letter containing same, received in yours as above.  I wired " him " to-day to take no action unless he has already done so.  I do not think that this arrangement will cover the point desired. What we wish to do is to sell the note outright for cash, and I do not think it will answer to sell it to a lawyer.  This is the opinion of our counsel here.  I trust that no action has been taken by " him.  " If so, please inform me what the status of the case is, and if a description of the note has been filed or given to the other side.  Will you please confer with " him ?   " E. A. Presbrey, Cashier."

August 1, Crippen sent his check for $4,000 to the Bank of Redemption for the note ; also his promissory note for $4,000 to be discounted and placed to the credit of Crippen, Lawrence & Co.  The bank received his check in payment of the Potter, White & Bayley note, discounted his note for $4,000, and sent him its written guaranty the same as that of July 16, except that it was dated July 30.

June 4, Crippen commenced a suit on the note for $4,490, and August 8 he commenced a suit on the note for $4,520.  In both suits he summoned Nute & Sons as trustees, and attached the property previously attached by Rogers, Wood, Loring & Co., subject to their attachment.  Both suits are pending in the supreme court for Merrimack county.

Crippen did not consent to the arrangements by which the shoe stock attached was manufactured into shoes and disposed of by the officer.  August 7, he notified him that he objected to such an arrangement unless his suits should be settled.  He has not in any way become a party to the insolvency proceedings. He learned of the failure of Potter, White & Bayley prior to June 1, and the bank learned of the failure and assignment May 26, or on the day following.

The plaintiff offers to prove that the transfer of the notes by the Bank of Redemption was an absolute and *bona fide* sale, giving to him the absolute ownership and control of the same.

*Streeter, Walker & Chase,* for the plaintiff, contended that the first assignment was fraudulent and void as against creditors in this state, and no title to the property in question passed to the assignees; that the insolvency proceedings in Massachusetts gave the assignees no interest or title to property in this state, and did not confer power upon them to sue for the debtors' property here as against the plaintiff; that the agreement by which Rogers, Wood, Loring & Co. were to bring suit in this state against the debtors to recover the property at Farmington, and to prosecute it in their name for the benefit of the assignees, was an attempt to conceal the true purpose of that suit from New Hampshire creditors, and, without their knowledge or the knowledge of this court, to enforce here the insolvency laws of another state; that consequently any nominal attachment Rogers, Wood, Loring & Co. may have acquired here should be set aside as against the attachment of Crippen, a citizen of this state.

*M. F. Dickinson, Jr.,* and *H. R. Bailey* (of Massachusetts), for the defendants.

SMITH, J.  If the Bank of Redemption had brought a suit in its own name for the collection of the notes transferred nominally to Crippen, the case would present no superior equity entitling the bank to appropriate the property attached in this state exclusively to its own debt.  Equity as well as comity would require the application of the property to the payment of all the creditors of the insolvents, under the insolvency laws of the state of the domicile of the bank.  *Kidder* v. *Tufts,* 48 N. H. 121; *Eddy* v. *Winchester,* 60 N. H. 63.

The plaintiff offers to prove that the transfer of the notes "was an absolute and *bona fide* sale of the same, giving to him the absolute ownership and control of the same."  But it is clear that the finding of such a fact would have to be set aside as being in direct and irreconcilable conflict with the admitted facts in the case, from which the only conclusion is that the transfer of the notes was a mere cover, to enable the bank to gain a preference over other Massachusetts creditors.

The plaintiff cites *Proctor* v. *National Bank of the Republic,* 152 Mass. 223, in support of the right to maintain his suits for the collection of the notes.  But the reasons which controlled the majority of the court in that case in refusing to compel a Massachusetts creditor, who had obtained an advantage over the other creditors by his proceedings in another state, to restore the property or its value to the assignee of a Massachusetts insolvent debtor, do not exist in this case.  There is no want of jurisdiction of the property or of the proper parties; and equity requires that the bank, under cover of suits in the name of a New Hampshire citizen, should not obtain an advantage over the other creditors in Massachusetts.

The leave given the plaintiff to defend the Strafford suits should be revoked (*Levy* v. *Woodcock*, 63 N. H. 413; *Martin* v. *Wiggin*, *ante*, *p.* 196) and the temporary injunction dissolved.

*Bill dismissed.*

ALLEN, J., did not sit: the others concurred.

The plaintiff moved for a rehearing.

*Streeter*, *Walker & Chase*, for the plaintiff. It is stated in the opinion that the admitted facts are " in direct and irreconcilable conflict " with the plaintiff's offer to prove that he is a *bona fide* holder of the notes for value.

As to the first note, the only evidence we can discover tending in any degree to show such " irreconcilable conflict " is the following: Crippen knew when he bought the note that the debtors had failed; an agent of the Bank of Redemption came to Concord and negotiated with him for the sale of the note, and gave him the agreement of indemnity; Crippen's letter to the bank asking if they wished to change the arrangement; Crippen's payment of the amount agreed upon for the note, and the fact of his borrowing money of the bank; his beginning proceedings for the collection of the note.

It is wholly immaterial what the secret purpose of the Bank of Redemption was in selling this note to Crippen. If it was not communicated to Crippen, and if he had no notice of it in any way, he is not chargeable with it. Admit that it was the purpose of the bank to obtain a practical advantage over other Massachusetts creditors by obtaining a larger percentage of their debt than other creditors would probably get: if Crippen honestly paid his money for the note for the purpose of gaining a few hundred dollars, and not for the purpose of carrying out the unexpressed and secret intention of the bank, how is he chargeable with the consequences of that intention? How can it be said, purely as a matter of fact and without a hearing, that " the transfer of the notes was a mere cover, to enable the bank to gain a preference over other Massachusetts creditors " ? It may have been a " cover " so far as the bank was concerned, and may also have been an honest, *bona fide* transaction on the part of Crippen.

The question is, Was it not possible for Crippen, under the circumstances disclosed by the case, to be a *bona fide* purchaser of the note? The agreement of indemnity which he took was little more in legal effect than the ordinary contract of an indorser, by which the indorsee for value may recover the amount of the note of the indorser if he fails to obtain it of the maker; and *Proctor* v. *Bank*, 152 Mass. 225, is an authority, if any were needed, that the title of the note passed to Crippen. Hence our objection to the opinion is, that it has found, from insufficient evi-

dence and without a hearing, as a fact, that it was impossible for Crippen to purchase the note in good faith for a valuable consideration.

If the finding is one of law on the agreed facts, it would be correctly stated as follows, as we understand the opinion : A resident of New Hampshire, who purchases here a promissory note from a resident of Massachusetts, knowing that the maker, also a resident of Massachusetts, has failed in business, and who takes a written guaranty from the seller to protect him against loss if he should not succeed in collecting the note, cannot be a *bona fide* holder of it for value, if the secret purpose of the seller was to obtain thereby a larger percentage on his claim than other Massachusetts creditors.—The fallacy of such a proposition consists in the assumption that the buyer's purpose was, as a matter of law, the same as the seller's, or that he was merely an agent of the seller.   Or it may be stated as follows : A resident of this state, who in actual good faith purchases a promissory note of a resident of Massachusetts for less than its face value, for the purpose merely of gaining thereby a few hundred dollars, knowing that the maker, also a resident of Massachusetts, has failed, is to be charged with notice of the seller's purpose to obtain a larger percentage on his claim than other Massachusetts creditors, and cannot be a *bona fide* holder of the note as against such creditors ; and in his suit to collect the note in this state he stands no better than the seller.   His actual intention or purpose to make an investment is immaterial.

The facts as to the second note are very similar to those already stated.

*M. F. Dickinson*, *Jr.*, and *H. R. Bailey* (of Massachusetts), for the defendants.

SMITH, J.   " Personal property has no locality, but is subject to the law which governs the person of the owner, except in cases which directly militate against the particular laws of the country in which it happens to be located."   *Saunders* v. *Williams*, 5 N. H. 213, 214.   " The general rule is, that a transfer of personal property, which is valid by the law of the owner's domicile, will operate to convey the property wherever it may be situate." *Sanderson* v. *Bradford*, 10 N. H. 260, 263.   " In the absence of ancillary administration or statutory prohibition, the domiciliary administrator or executor has authority to take possession of and remove the goods or effects of the decedent in another jurisdiction, or to collect a debt due from a debtor residing therein, if voluntarily given up or paid, and give a good acquittance and discharge therefor.   .   .   .   So, too, he may sell and assign stock in a foreign corporation, and the corporation may voluntarily consent to its transfer by accepting the outstanding certificate and

issuing a new one to the purchaser." *Luce* v. *Railroad*, 63 N. H. 588, 590.

"It has long been the policy of commercial states not to embarrass the free transmission of the title to personal property. And it has been very justly considered as discourteous and illiberal policy in one state to abridge and fetter the operation of foreign contracts within its limits, or to refuse to enforce them by suits maintained in its courts, or to embarrass foreign owners of personal estate within its limits, in the free enjoyment of its beneficial use, or its ready and unrestricted conveyance. . . . In the law, personalty is generally regarded as having no *situs*. Its title, mode of transfer, and other incidents connected with its use and transmission, are regulated according to the law of the place of the domicile of the owner. This is confessedly true in regard to the requisite formalities in the execution of a will of personalty, although essentially departing from the requirements of the law of the state where such property happens to be situated at the time of the decease of the owner. It is the law of the place of the domicile of the owner which must control these incidents, as to the operation of wills upon personal estate, and also the distribution of intestate estates, according to the general rules of international comity among civilized and commercial states. . . . . . But it is claimed that in regard to the distribution of one's effects (while living) among his creditors, a different rule to some extent has prevailed." *Hanford* v. *Paine*, 32 Vt. 442, 452, 454.

"It is said that the laws of a state or country do not have any extra-territorial operation *suo vigore*, but that such operation is only granted *ex comitate*. This is the common language of the opinions, but it is an extremely unsatisfactory ground on which to place a decision. For the fact is, that the laws of one state or country are recognized by other states and countries continually, and in many different ways; and in cases in which it is settled on the principles of that branch of jurisprudence known as Private International Law, or the Conflict of Laws, that foreign law should apply, such law is applied as a matter of course by the courts, without the exercise of any vague or irresponsible discretion. . . . In regard to rights under contracts, the law of the place of the contract governs, although the law of the former controls in all questions as to the remedy. So, also, it is a settled rule with regard to succession to personal property by will or intestacy, that the law of the domicile shall govern, even as to property in a foreign jurisdiction. . . . We therefore feel justified in saying that it is not generally a safe reason to assign for the decision of any of these questions that foreign laws have no extra-territorial operation." 15 Am. Law Rev. 254, 255.

A general rule, that a transfer of personal property, which is valid by the law of the owner's domicile, will convey the property wherever situate, may clash with a general rule that law has no

extra-territorial operation.   It seems to be immaterial which is called the rule and which the exception.   The property in controversy in this case should be applied to the payment of debts under the insolvency laws of Massachusetts, unless this disposition of it would infringe the right of a citizen of this state.   If the Bank of Redemption had not gone through the form of selling its notes to the plaintiff, and had brought suit upon them in this state and attached the debtor's chattels and land, the land as well as the chattels might become assets in the hands of the Massachusetts assignees notwithstanding the attachment; and, as between the bank and the assignees, the justice of the case and the law of this state would require such procedure as would enable the assignees to apply the attached property to the payment of debts under the law of Massachusetts.   *Eddy* v. *Winchester*, 60 N. H. 63, 64.   Our law does not unnecessarily allow its process to be used by a Massachusetts creditor to avoid the just operation of the insolvency law of that state.

The view of the agreed facts most favorable to the plaintiff is, that the transaction between him and the bank is what it appears to be on the face of the writings.   Upon that view the plaintiff will make a profit of about one thousand dollars if he prevails in this suit, and will lose nothing if he fails.   If he prevails, the bank will get or keep eight thousand dollars, less expenses of suits, which it is to pay in any event.   The guaranty given him by the bank makes the bank the principal plaintiff in interest. The practical effect of the whole transaction is the use of the plaintiff's name in New Hampshire litigation, instituted and carried on in behalf of the bank and at its expense, to enable it to defeat the just law of its own state.   If the bank succeeds in this enterprise, it pays him a commission of about one thousand dollars.   If it does not succeed, it pays him nothing.   The speculative interest which this arrangement gives him does not entitle him to set up a New Hampshire right as a cover under which a Massachusetts creditor can avoid the Massachusetts law.   In some sense and for some purposes he could be regarded as the owner of the notes.   But he is not the owner in any equitable sense that would give him a position superior to that of the bank in an effort to prevent the application of the attached property to the payment of debts under the law of Massachusetts.   The equity of the case is with the assignees.   If they had taken and held possession of the goods, their title would have been upheld against the plaintiff.   The attachment made by the defendants, Rogers, Wood, Loring & Co., was not necessary for the protection of the assignees' rights against the suits brought by the plaintiff chiefly for the benefit of a Massachusetts creditor, and for his own benefit merely as a claimant of a bonus to be paid by the Massachusetts creditor for the use of his name in litigation.

The plaintiff's leave to appear in the suit brought by the

defendants in Strafford county will be revoked at the next trial term in September. To prevent delay that might be caused at that term from the pendency of this action in this county, the decree dissolving the injunction and dismissing the bill is rendered at the present law term.

*Bill dismissed.*

ALLEN, J., did not sit: the others concurred.